UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2003 JUL -2 P 2:07

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| TREXEL, INC. and<br>MASSACHUSETTS INSTITUTE<br>OF TECHNOLOGY,<br><br>Plaintiffs,<br><br>v.<br><br>DISPOZ-O PRODUCTS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. NO. 04CV10879-JLT<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF DISPOZ-O PRODUCTS, INC.'S MOTION FOR TRANSFER OF VENUE PURSUANT TO 28 U.S.C. § 1404(a)

### INTRODUCTION

This matter is before the Court upon Defendant Dispoz-o's motion to transfer venue to the United States District Court for the District of South Carolina, the site of the first lawsuit between Dispoz-o and Trexel. This is the second lawsuit between Trexel, Inc. ("Trexel") and Dispoz-o Products, Inc. ("Dispoz-o"). The first lawsuit was filed by Dispoz-o in District Court in South Carolina in February of 2002, *Dispoz-o Products, Inc. vs. Trexel, Inc.*, Civil Action No.: 02-CV-617, alleging that the foam manufacturing process and equipment that Trexel licensed and sold to Dispoz-o, for manufacturing that would occur solely in South Carolina, did not work. That lawsuit was settled. Trexel has now raced to Court in Massachusetts, instead of South Carolina, in a preemptory effort to avoid paying sums of money which have just now matured and are now due under the written settlement agreement in the earlier South Carolina lawsuit.

The written settlement agreement, dated June 13, 2002, specifically provides that it is governed by South Carolina law. The settlement agreement provides that Trexel was to make three payments to Dispoz-o. The first payment of $140,000.00 was to be paid upon the signing of the settlement agreement. The second payment, also in the amount of $140,000.00, was to be paid when Dispoz-o returned the Trexel equipment to Trexel. These two payments, totaling $280,000.00, represented a refund of the deposit amounts that Dispoz-o had paid to Trexel. The $280,000.00 was in fact paid by Trexel. The settlement agreement further provided that Trexel would pay damages to Dispoz-o in the amount of $500,000.00. The damages were to be paid at the rate of $10,000.00 per month commencing July 1, 2004, approximately two years after the settlement agreement was signed.

As this critical payment deadline of July 1, 2004 approached, Dispoz-o had heard nothing from Trexel since the settlement agreement was signed two years ago, and was expecting payments to begin in a timely manner. However, unbeknownst to Dispoz-o, Trexel was not preparing to honor its payment obligations as set forth in the settlement agreement. Instead – without once contacting Dispoz-o – Trexel filed this lawsuit against Dispoz-o, and filed it in Massachusetts instead of in South Carolina. Trexel now seeks the aid of this Court in setting aside and voiding Trexel's obligations to pay the $500,000.00 owed pursuant to the written settlement agreement in the South Carolina lawsuit.

It is Dispoz-o's contention that this lawsuit, just like the first lawsuit, should be in South Carolina. The settlement agreement in question arose from a Federal Court lawsuit which was filed in South Carolina. The settlement agreement specifically provides that it

2

is governed by South Carolina law. Defendant's complaint in this lawsuit alleges specific causes of action that are based solely upon South Carolina law, including South Carolina Unfair Trade Practices Act, South Carolina Trade Secrets Act, and a unique South Carolina cause of action known as Breach of Contract Accompanied by a Fraudulent Act.

Moreover, from a practical standpoint, all of the attempted manufacturing of the foam by Dispoz-o occurred in South Carolina. All of the Trexel equipment was shipped to South Carolina for use in South Carolina. Dispoz-o's only manufacturing plant is in South Carolina. All of the manufacturing activities that Trexel now claims infringe patents or breach the settlement agreement occurred, and are occurring today, only in South Carolina. All of the witnesses to the production efforts necessarily will be testifying about events that occurred in South Carolina.

A final critical factor to consider is that Dispoz-o anticipates asking the trial judge to allow the jury to view the manufacturing operations that Trexel now claims either infringe the patents or breach the settlement agreement. This onsite review can only occur in South Carolina, which also strongly militates in favor of the trial being held in South Carolina. Dispoz-o should not be handicapped in its efforts to obtain a full and fair trial by Trexel rushing to Court, unannounced, on the eve of the commencement of its obligation to pay Dispoz-o pursuant to a written settlement agreement reached in a previous South Carolina lawsuit.

Accordingly, for the reasons stated herein, Dispoz-o respectfully requests this Court to transfer this action to the same venue as the first action, the United States District Court for the District of South Carolina, Greenville Division.

3

## BACKGROUND

1.   **The Parties**

Dispoz-o is a manufacturer of plastic cutlery, which are produced by an injection molding process, and plastic drinking straws, which are produced by an extrusion process. Dispoz-o has been in business since 1963, and its sole manufacturing facility is a 520,000 square foot plant located on approximately eighty-two acres in Fountain Inn, South Carolina. Prior to becoming involved with Trexel, Dispoz-o was not engaged in making any foam products via extrusion molding. (Foster Aff., ¶ 2; Lineberger Aff., ¶ 2).

All of Dispoz-o's manufacturing occurs in South Carolina. (Foster Aff., ¶ 3; Lineberger Aff., ¶ 3). None of Dispoz-o's manufacturing occurs in Massachusetts. (Id.). All of Dispoz-o's executive and sales offices are also in South Carolina. (Id.). Dispoz-o makes no direct sales of its products in Massachusetts, though it sells to distributors in other states who may then sell into Massachusetts. (Lineberger Aff., ¶ 3). Dispoz-o also has distribution centers located in Commerce, California and Houston, Texas. (Foster Aff., ¶ 3; Lineberger Aff., ¶ 3). All Dispoz-o employees with knowledge of the issues raised in the Complaint, and who will likely be witnesses in this matter, reside in South Carolina. (Id.).

Based upon its advertising and website, Trexel is in the business of licensing a "MuCell" process to produce microcellular foam, and selling certain equipment necessary to implement the process. (Foster Aff., ¶ 4). The MuCell process involves injecting a gas, such as Carbon Dioxide or Nitrogen, into molten plastic during the manufacturing process, and utilizing that gas to create tiny, microscopic cells. (Id.). In injection molding applications, this results in a part which is no longer "solid". (Id.).

4

Instead, it is filled with microscopic cellular pockets. (Id.).  According to Trexel, the

MuCell process allows an injection molder to use less raw material, have lower clamp

pressures and lower clamp times, thereby obtaining substantial cost savings in the

manufacturing process. (Id.).  Trexel advertises that the "MuCell technology can be

retrofitted easily into injection molding …equipment" and that Trexel provides full

"turnkey" support. (Foster Aff., ¶ 4; Trexel advertising, Exhibit A to Foster Affidavit).

Trexel's current website advertises that conversion of existing injection molding

equipment is a "simple on-site installation within one week." (Foster Aff., ¶ 4).

Based upon its advertising and website, Trexel works with plastic machinery

equipment suppliers throughout the world who offer the MuCell option for their standard

injection molding machines. (Foster Aff., ¶ 5).  As part if its business, Trexel engineers

travel to the manufacturer's facilities to assist in the implementation of Trexel's process.

Trexel has regional MuCell support centers throughout the United States, and in

Germany, Japan, Singapore, and Korea. (Id.).

2.    **The Licensing Agreement**

Trexel initially proposed to Dispoz-o that it add the MuCell process to its

injection molding process for making plastic cutlery. (Foster Aff., ¶ 6).  Dispoz-o did not

accept this proposal, nor Trexel's proposal to add the MuCell process to its extrusion

process for making plastic drinking straws. (Id.).  Trexel also indicated, however, that its

MuCell process could be used to produce polystyrene foam sheet by extrusion. (Id.).

The foam sheet could then be heated and formed (thermoformed) to produce foam

product, such as a plate or tray.  (Id.).

Dispoz-o was interested in this because it had considered entering the field of manufacturing foam trays. (Foster Aff., ¶ 7).  Dispoz-o had evaluated entering the foam business via a conventional extrusion process which uses hydrocarbon blowing agent(s). While these conventional processes are commercially viable, there are certain inherent dangers in using hydrocarbon blowing agent(s). (Id.).  Dispoz-o was not inclined to commence a foam manufacturing operation using hydrocarbon blowing agent(s). (Id.).

In May of 2000, Trexel made an initial proposal to Dispoz-o whereby Trexel would design and provide MuCell equipment, and a process that would produce quality foam sheet capable of being thermoformed into trays. (Foster Aff., ¶ 8).  The Trexel equipment was only part of the equipment to be purchased. (Id.).  Dispoz-o would have to purchase equipment from other manufacturers. (Id.).  Although this other equipment was considered "standard" in the industry, Trexel agreed to assist Dispoz-o in the selection and specification of this other equipment, which was provided by Battenfield Gloucester Engineering ("BGE"). (Id.).  Dispoz-o did not convert any existing equipment for the project. (Id.).

The parties continued to negotiate, and entered into an Extrusion License Agreement in September, 2000. (Foster Aff., ¶ 9).   The agreement required Dispoz-o to purchase four sets of equipment from Trexel, one set for each of four foam extrusion production lines. (Id.).  The Trexel equipment for each line consisted of a primary extruder screw (offered at $18,000.00), a four-injector kit (offered at $10,000.00), die tooling (estimated at $10,000.00), and a blowing agent delivery system (offered at $123,240.00). (Id.).  This is a total of $161,240.00 per line, or $644,960.00 for all four lines. (Id.).  Under the terms of the Extrusion License Agreement, Dispoz-o was to pay

6

license fees of $45,000 to $60,000.00 per year per line, for a total of $1,410,000.00 over a seven year period. (Id.). Dispoz-o's total commitment to Trexel, in equipment purchases and license fees, was over 2 million dollars. (Id.). In addition, Dispoz-o was constructing a facility and was purchasing equipment from other manufacturers. (Id.).

In return, Trexel was to provide equipment and a process that would produce 925 pounds per hour per line of good quality, thermoform-able foam sheet. (Foster Aff., ¶ 10). Dispoz-o's business model projected it could operate profitably at the rate of 925 pounds per hour. (Id.). The license agreement also provided for Trexel to supply on-site start up support in South Carolina for up to fifteen days in up to three separate trips. (Id.). Production was never anticipated to be run in Massachusetts. Indeed, according to its website, Trexel's lab equipment has a maximum production capacity of two hundred pounds of foam per hour.

The Extrusion License Agreement was signed in September, 2000, thereby providing Trexel with ample opportunity to complete any developmental and/or manufacturing work that it needed to do in order to meet the guaranteed production rate. (Foster Aff., ¶ 11). Lines two through four were scheduled to start production in October, 2001, January, 2002 and March, 2002, respectively. (Id.). Dispoz-o expected to be up and running in July, 2001. (Id.).

In June, 2001, Trexel reviewed and approved certain advertising material to be utilized by Dispoz-o regarding the MuCell foam tray products. (Foster Aff., ¶ 12). As far as Dispoz-o knew, everything was on schedule for a July, 2001 production commencement date. (Id.).

7

In fact, however, Trexel failed to satisfy its obligations under the licensing agreement. Trexel did not have a commercially viable foam manufacturing process that would produce consistent foam product, much less produce it at a rate of 925 pounds per hour. (Foster Aff., ¶ 13). Instead of fifteen days of on site support to get four foam extrusion lines up and running, Trexel spent at least eighty-eight days, or over five hundred percent more time, just trying to get the first two lines up and running. (Id.). Trexel was never able to even do this successfully. (Id.).

As late as August, 2001, Trexel was still setting parameters for attempted test runs at Dispoz-o for only 480 pounds per hour. (Foster Aff., ¶ 14; Trexel e-mail dated August 16, 2001, Exhibit B to Foster affidavit). Also in August, 2001, Irwin Research and Development, Inc., the thermoforming equipment manufacturer, advised Dispoz-o it was not going to return to the plant until it was assured that there was good quality foam sheet to use to set up the thermoforming process. (Foster Aff., ¶ 14; Irwin letter dated August 28, 2001, Exhibit C to Foster affidavit).

In early September, 2001, Dispoz-o notified Trexel that it was frustrated with this two and one-half months of "testing", and advised Trexel that Dispoz-o now had over 14 million dollars invested in this project and had lost 4.6 million in sales already. (Foster Aff., ¶ 15; letter from Peter R. Iacovelli, of Dispoz-o, to David Bernstein, of Trexel, dated September 11, 2001 with attachments, Exhibit D to Foster affidavit). Shortly thereafter, and in an effort to seek more time to make the process work, Trexel admitted that high quality sheet had only been produced once or twice on line number one since July, 2001, and never on line two. (Foster Aff., ¶ 16; Trexel draft proposal dated September 25, 2001, Exhibit E to Foster affidavit). Trexel admitted it had not foreseen certain problems

8

that were preventing production of foam at the guaranteed rate. (Foster Aff., ¶ 16).

Trexel also proposed that Dispoz-o should cancel the orders for lines three and four at

that point in time.  (Id.).

      Subsequently, on October 5, 2001, David Bernstein, Trexel's President again

admitted that on line two "there have never existed the conditions to run the microcellular

foam process and to make microcellular foam products on this line." (emphasis added)

(Foster Aff., ¶ 17; Letter dated October 5, 2001, Exhibit F to Foster affidavit).  Trexel

also acknowledged the "focus, commitment, good will, and competence of your team",

with reference to the Dispoz-o personnel who were assisting to get the process up and

running. (Id.).

      On October 10, 2001, Dispoz-o again detailed the myriad of problems and gave

Trexel until December 1, 2001 to get the process up and running. (Foster Aff., ¶ 18;

Trexel letter of October 5, 2001, Exhibit G to Foster affidavit).  In response, Trexel again

wrote and admitted "the whole system has never yet operated successfully at 925 pounds

per hour." (Foster Aff., ¶ 19; Dispoz-o letter of October 10, 2001, Exhibit H to Foster

affidavit). Nevertheless, at the end of October, Trexel was still using process

development plans showing attempted run rates of only 480 pounds per hour. (Foster

Aff., ¶ 19; Trexel "Process Development Plan" of October 29-30, 2001, Exhibit I to

Foster affidavit).

      Another meeting was held at Dispoz-o in November, 2001. (Foster Aff., ¶ 20).  At

this meeting, Trexel (David Bernstein and Jere Anderson) presented an Ishikawa

diagram, also referred to as a "fishbone" diagram.  (Foster Aff., ¶ 20; Ishikawa, Exhibit J

to Foster affidavit).  This diagram had a whole list of probable causes of the end product,

which was listed as "bad sheet." (Id.). Needless to say, Trexel was nowhere close to achieving a commercially viable process or to satisfying its contractual obligations.

Furthermore, Trexel had represented to Dispoz-o that Trexel's technology and patents did not infringe upon patents belonging to any other party and that Trexel's patents were valid and enforceable. (Foster Aff., ¶ 21). In late 2001, however, Dow Chemical Company asserted, that by using Trexel's $CO_2$ technology, Dispoz-o was violating Dow's patents. (Id.). By letter dated January 11, 2002, Trexel acknowledged to Dispoz-o that it had proceeded to entered into a license with right to grant sub-license with the Dow Chemical Company under U.S. Patents No. 5, 250, 577 and No. 5, 266, 605. (Id.).

**3.    Dispoz-o's South Carolina Lawsuit and Resulting Settlement Agreement**

On or about February 25, 2002, Dispoz-o commenced suit against Trexel in the United States District Court for the District of South Carolina, Greenville Division, alleging deceit, negligent misrepresentation, fraud in the inducement, breach of contract, breach of the implied covenant of good faith and fair dealing and seeking reformation of contract, or in the alternative, revision, all relating to the License Agreement. (Trexel Complaint, ¶ 25)  On or about May 2002, Dispoz-o and Trexel mediated their dispute and, as a result of the mediation, entered into the Settlement Agreement on June 13, 2002. (Trexel Complaint, ¶ 26; Exhibit D to Trexel Complaint).

The Settlement Agreement provides that Trexel would pay Dispoz-o  One Hundred Forty Thousand Dollars ($140,000.00) upon execution of the settlement agreement, that Dispoz-o would return specific equipment to Trexel, and that Trexel would pay Dispoz-o an additional One Hundred Forty Thousand Dollars ($140,000.00)

upon return of the equipment. Dispoz-o and Trexel performed the above requirements pursuant to the Settlement Agreement. (Id.).

In addition, the Settlement Agreement provided that Trexel would execute a promissory note in the amount of $500,000.00 in favor of Dispoz-o secured by royalty and licensing income pursuant to a security agreement. The settlement agreement provided the first payment under the promissory note would become due and payable by July 1, 2004 and interest at a rate of 6% per annum. (Id.).

The Settlement Agreement specifies that it is to be governed by South Carolina law. (Id.).

4.    **Trexel/MIT's Massachusetts Lawsuit**

On the eve of the first payment's coming due under the promissory note, and with no prior demand or communication at all with Dispoz-o, Trexel and MIT commenced this action in the federal district court in Massachusetts alleging patent infringement and seeking to be excused from making the agreed upon payment under the Settlement Agreement. (Trexel Complaint). Had Trexel failed to make the payment, it would have been subject to suit by Dispoz-o in South Carolina for breach of the Settlement Agreement. (Settlement Agreement).

The gist of Trexel's complaint is that, before returning the Trexel equipment as required under the Settlement Agreement, Dispoz-o copied the Trexel equipment such that it is currently employing, in its South Carolina manufacturing facility, equipment and processes that infringe upon Trexel/MIT's patents. (Trexel Complaint). In addition to Federal claims for patent infringement, Trexel asserts state law claims under South Carolina law. Specifically, in addition to common law claims of breach of contract and

11

fraud, Trexel asserts an additional common law claim unique to South Carolina known as breach of contract accompanied by a fraudulent act, as well as claims pursuant to South Carolina statutes, specifically unfair trade or business practices in violation of S.C. Code Ann-Section 39-5-20 (2003) and misappropriation of trade secrets in violation of S.C. Code Ann-Section 39-8-20 (5)(2003). (Id.).

**5.    Location of Witnesses and Evidence**

At the outset of this litigation Trexel filed a Motion for Preliminary Injunction seeking an order to preserve certain evidence. (Trexel Motion). Specifically, Trexel sought to preserve, among other things, documents relating to Dispoz-o's manufacture of MFPs both prior to and after the filing of this action and equipment that Dispoz-o used in its manufacture of MFPs, both prior to after the filing of this action. (Id.). Significantly, all the evidence Trexel seeks to preserve is located at Dispoz-o's manufacturing facility in South Carolina. Dispoz-o voluntarily entered into a joint stipulation agreeing to preserve the South Carolina evidence.

Similarly, the majority of persons likely to be called as witnesses in this case reside in South Carolina or outside of Massachusetts. Witnesses from Dispoz-o who may testify regarding Dispoz-o's current manufacturing operation include Peter R. Iacovelli, Joseph D. Lancia, George Rodriguez, David R. Foster, and Alex Ali, a former Dispoz-o employee, all of whom are residents of South Carolina. (Foster Aff., ¶ 22).

Witnesses from Trexel, who were directly involved in the project and thus could testify to Trexel's embodiment of the patents, include Kelvin Okamoto, John Park, Jere Anderson and Kent Blizard. (Foster Aff., ¶ 23). These individuals are engineers and scientists employed by Trexel, and were at Dispoz-o's manufacturing facility in an effort

12

to achieve the represented performance requirements. (Id.). Upon information and belief, Dr. Okamoto is a resident of California. (Id.). Upon information and belief, Mr. Anderson and Dr. Blizard are residents of Massachusetts. (Id.). Dispoz-o is unaware of Mr. Park's residence. Other potential witnesses from Trexel include David Bernstein, Richard Straff, and Roman Barski. (Id.). Mr. Bernstein is believed to be a resident of Massachusetts. (Id.). Dr. Straff is believed to be a resident of New Jersey. (Id.). Mr. Barski is believed to be a resident of Illinois. (Id.).

Witnesses from BGE directly involved in the project and Trexel's embodiment of the patents include Tom Talbot and Nick Nigro. (Foster Aff., ¶ 24). Mr. Talbot is a Field Service Engineer, who was at Dispoz-o's manufacturing facility and is believed to be a resident of Florida. (Id.). Mr. Nigro is BGE's Southeast Regional Sales Manager, and is believed to be a resident of Georgia. (Id.). Other potential witnesses from BGE include its Vice President of Sales and Marketing, Robert Weeks, its product manager, Doug Comeau, its Vice President of Engineering, Ken Warnock, and an engineer, Ken Sweet, who are believed to be residents of Massachusetts. (Id.).

Subsequent to Trexel's failures to achieve the represented performance requirements, Dispoz-o consulted with other engineers and companies in the foam industry. (Foster Aff., ¶ 24). Specifically, Dispoz-o primarily consulted with Horst Dirtmar-Groene, who is a resident of Germany, and Linde Gas LLC, headquartered in Cleveland, Ohio. (Id.). Witnesses from Linde Gas LLC include Michael Abshire, Applications Engineer, who is believed to be a resident of Ohio, and Richard Waskom, Process Market Manager, who is believed to be a resident of Georgia. (Id.). These witnesses may be called to testify about Dispoz-o's current manufacturing operation.

13

## ARGUMENT

**I.    THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA IS THE APPROPRIATE FORUM FOR THIS MATTER.**

Based on the Plaintiffs' allegations and the undisputed material facts, South Carolina is the appropriate forum for this case. It can not be disputed that the United States District Court for the District of South Carolina would have jurisdiction over the parties and the subject matter over this case. Further, as discussed more fully below, considerations of convenience and judicial economy strongly favor litigating the claim in South Carolina.

### A.    Standard for Forum Non Conveniens.

When a defendant moves to transfer a case based on forum non conveniens, it bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum. *Haidee Iragorri, Etc. v. Int'l Elevator, Inc.*, 203 F.3d 8, 6 (1st Cir. 2000), *citing Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 423-424 (1st Cir. 1991). The first requirement is deemed satisfied upon a showing that the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there. *Haidee Iragorri, Etc.*, 203 F.3d at 6, *citing Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981). The second requirement evokes a more sophisticated balancing: the defendant must show that the compendium of factors relevant to the private and public interests implicated by the case strongly favors transfer. *Haidee Iragorri, Etc.*, 203 F.3d at 6-7, *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947); *Mercier*, 935 F.2d at 423-24.

14

Considerations relevant to the litigants' private interests include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [and the] possibility of view of premises, if view would be appropriate to the action." *Haidee Iragorri, Etc.,* 203 F.3d at 7, *quoting Gilbert,* 330 U.S. at 508. Evaluating private interests also requires the trial judge to pay heed to "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* Further, those factors that threaten to make trial more cumbersome, prolong it, or drive up costs are equally pertinent. *Haidee Iragorri, Etc.,* 203 F.3d at 7-8.

Factors relevant to the public interest include such things as the administrative difficulties of docket congestion; the general goal of "having localized controversies decided at home," and concomitantly, ease of access to the proceedings on the part of interested citizens; the trier's relative familiarity with the appropriate rules of decision; and the burdens of jury duty. *Haidee Iragorri, Etc.,* 203 F.3d at 8, *quoting Gilbert,* 330 U.S. at 508-509. Not every item applies in every case and, in the last analysis, the list of factors is illustrative rather than all-inclusive. *Haidee Iragorri, Etc.,* 203 F.3d at 8. "The ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Id., citing Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527 (1947).

While the plaintiff's choice of forum is given deference by the courts, in a patent infringement case, where "the central facts of a lawsuit occur outside the forum state, plaintiff's choice of venue is accorded less deference." *Saint-Gobain Clamar, Inc. v. National Products Corp.,* 230 F. Supp. 2d 655 (E.D. Pa. 2002). Further, the plaintiff

15

should not be rewarded for filing suit in anticipation of the defendant filing suit later. *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc.*, 249 F. Supp. 2d 12, 16 (D. Mass. 2002) (plaintiff's choice of forum overcome where it reacts to a defendant's notice of imminent filing by literally sprinting to the courthouse); *Davox Corp. v. Digital Systems Intern., Inc.*, 846 F. Supp. 144, 148 (D. Mass. 1993) (same).

**B.    The Center of Gravity of This Case is in South Carolina.**

The heart of this dispute is whether Dispoz-o is infringing upon the Plaintiffs' patents through its manufacturing of MFPs at its facilities in Fountain Inn, South Carolina - Dispoz-o's only manufacturing facility.  Accordingly, the relative ease of access to sources of proof, availability and costs of obtaining the attendance of witnesses and the cost associated with a view of premises all favor transfer of this case to South Carolina.

"In patent infringement cases, the preferred forum is that which is the center of gravity of the accused activity." *Saint-Gobain Clamar, Inc. v. National Products Corp.*, 230 F. Supp. 2d 655 (E.D. Pa. 2002) *citing Renzetti, Inc. v. D.H. Thompson, Inc.*, 1997 U.S. Dist. LEXIS 6121 (E.D. Pa. 1997); *Lennco Racing Co., Inc. v. Arctco, Inc.*, 953 F. Supp. 69 (W.D.N.Y. 1997). The "center of gravity" for such a claim is in the district where the alleged infringement occurred, and in finding that "center of gravity," a district court "ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production." *Saint-Gobain Clamar, Inc.*, 230 F. Supp. 2d at 660, *quoting Renzetti, Inc.*, 1997 U.S. Dist. LEXIS 6121.  "Appropriate considerations include the location of a product's development, testing, research and production [and] the place where marketing and sales decisions were made, rather than where limited sales

activity has occurred." *Saint-Gobain Clamar, Inc.,* 230 F. Supp. 2d at 660, *quoting Ricoh Co., Ltd. v. Honeywell, Inc.,* 817 F. Supp. 473, 482 n.17 (D.N.J. 1993).

The First Circuit and other jurisdictions have recognized that the most appropriate forum in a patent infringement action is where the genesis of the infringing activity occurs, and have regularly and consistently transferred venue to those jurisdictions. *See e.g. Clinical Dynamics Corp. v. Dynatech Nevada Inc.,* 1994 U.S. Dist. Lexis 8747 (D. Mass. 1994) (transferring patent infringement action to Nevada - defendant's forum-noting that Nevada is where the development and marketing of allegedly infringing product occurred, where employees knowledgeable in the development and marketing live and work, and where documents pertaining to the product are located); *Lennco Racing Co., Inc. v. Arctco, Inc.,* 953 F. Supp. 69 (W.D.N.Y. 1997) (transferring case brought by New York corporation to Michigan where defendants manufacturing facilities located); *Anadigics, Inc. v. Raytheon Co.,* 903 F. Supp. 615 (S.D.N.Y. 1995) (transferring infringement action to Massachusetts, where the acts relating to defendant's alleged infringement occurred); *Boreal Laser, Inc. v. Coherent, Inc.,* 1992 U.S. Dist. LEXIS 276 (S.D.N.Y. 1992) (transferring patent infringement action to California, where the alleged infringement occurred and all relevant documents, records, and production facilities were located); *Coloplast A/S v. Amoena Corp.,* 1992 U.S. Dist. LEXIS 17587 (S.D.N.Y. 1992) (transferring patent infringement action to Georgia, where the alleged infringing product was manufactured and sold and all relevant documents, records, and production facilities were located); *Volk Corp. v. Art-Pak Clip Art Serv.,* 432 F. Supp. 1179 (S.D.N.Y. 1977) (transferring infringement action to California, where defendants and their business records were located and the infringing artwork was printed).

17

Here, the core of Trexel's allegations is that Dispoz-o has breached the Settlement Agreement and infringed upon certain of its purported patents by Dispoz-o's manufacture of MFPs at its manufacturing facilities in South Carolina. All relevant witnesses in connection with Dispoz-o's manufacturing process are located either in South Carolina or outside of Massachusetts. Further, all of the documents, machinery and equipment in connection with Dispoz-o's manufacturing process are located at its facilities in South Carolina. Indeed, all of the evidence that Trexel sought to preserve through its Motion for Injunctive Relief at the outset of this litigation is located in South Carolina. It goes without saying that the relevant equipment and machinery is not readily movable, and that the only way to personally inspect them is by viewing them in South Carolina.

### C.    South Carolina Law Will Govern a Substantial Portion of the Case.

The United States District Court for the District of South Carolina will be more familiar with the controlling precedent governing this case. It is appropriate to transfer a case to a forum that is most familiar with the state law that must govern the case. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509 (1947); *Wright v. American Flyers Airline Corp.,* 263 F. Supp. 865, 867-868 (D.S.C. 1967). In considering the "interests of justice," appropriate weight should be given to the desirability of having federal judges interpret the law of the state in which they sit. *Vaughn v. American Basketball Ass'n,* 419 F. Supp. 1274, 1278 (S.D.N.Y. 1976), *citing Van Dusen v. Barrack,* 376 U.S. 612, 644-646 (1964).

Here, Trexel has asserted numerous state law claims arising from the Settlement Agreement, which is by its terms governed by the laws of South Carolina. Indeed, Trexel has asserted a claim for breach of contract accompanied by a fraudulent act, a cause of

18

action that is unique to South Carolina law and has no direct counterpart in Massachusetts law. In addition, Trexel has asserted a claim under South Carolina's Unfair and Deceptive Trade Practice Act, S.C. Code Ann. 39-5-140, and for Misappropriation of Trade Secrets pursuant to S.C. Code. Ann. 39-8-20 *et seq.* While this Court is certainly competent to hear and decide such claims, a federal judge in South Carolina will be more familiar with South Carolina law. Accordingly, granting of Dispoz-o's Motion to Transfer will serve the interests of judicial economy.

### D.    Plaintiffs' Choice of Forum Should be Given Less Deference and is Overcome by Other Factors.

Under the circumstances of this case, Plaintiff's choice of forum is entitled to no deference. First, as discussed more fully above, this case concerns Dispoz-o's manufacturing process which takes place in its entirety in South Carolina. In a patent infringement case, where "the central facts of a lawsuit occur outside the forum state, plaintiff's choice of venue is accorded less deference." *Saint-Gobain Clamar, Inc. v. National Products Corp.*, 230 F. Supp. 2d 655 (E.D. Pa. 2002). Here, the central facts and witnesses occurred in or are located in South Carolina. Accordingly, Trexel's chosen forum should be given less deference.

Second, this case involves alleged breaches of a Settlement Agreement resulting from a case filed in the United States District Court for the District of South Carolina. The Settlement Agreement provides that it is governed by South Carolina law. As such, this case in essence originated in South Carolina which has more significant ties and interest in resolving this dispute.

Third, the plaintiff's choice of forum is overcome where, as here, the filing of a lawsuit is made in anticipation of a later filing by the defendant. It is reasonable to infer

19

that Trexel/MIT filed this case on the eve of the promissory note's becoming due, in part, to avoid being sued for non-payment in South Carolina. As Trexel will attest an the Settlement Agreement reflects, Trexel's licensing of its "technology" to Dispoz-o was an unmitigated disaster. Trexel simply used Dispoz-o and its South Carolina manufacturing facility as a "beta" site to attempt to develop a commercial foam process that did not exist and did not work. Here, Trexel sat idly by for approximately two years as Dispoz-o was allegedly infringing upon there patents. Less than one-month before it was obligated to make payment pursuant to the promissory note, however, and with no prior demand to Dispoz-o, Trexel filed this lawsuit in Massachusetts. It is reasonable to infer that the filing of this case was to avoid a suit for non-payment under the promissory note in South Carolina. *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc.*, 249 F. Supp. 2d 12, 16 (D. Mass. 2002) (plaintiff's choice of forum overcome where it reacts to a defendant's notice of imminent filing by literally sprinting to the courthouse). Under the circumstances, this Court should give no weight to the "plaintiff's" choice of forum in determining the appropriate venue for resolution of this dispute.

## CONCLUSION

For the reasons set forth above, the motion for transfer of venue pursuant to 28 U.S.C. § 1404(a) should be allowed and this case should be transferred to the United States District Court for the District of South Carolina, Greenville Division.

Respectfully submitted
DISPOZ-O PRODUCTS, INC.
By its attorney,


Joan M. Griffin, BBO#: 549522
James A.G. Hamilton, BBO #: 218760
Daniel McCarthy, BBO#: 651559
PERKINS, SMITH & COHEN, LLP
One Beacon St., 30th Flr.
Boston, MA  02108
(617) 854-4297


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the
attorney of record for the Plaintiff, Richard A. Johnston, Esq. by hand on July 2, 2004.


Joan M. Griffin


31298-2-MemoVenueFinal.doc