UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TREXEL, INC. and )
MASSACHUSETTS INSTITUTE )
OF TECHNOLOGY, )
)
Plaintiffs, )
)
v. ) C.A. NO. 04CV10879-JLT
)
DISPOZ-O PRODUCTS, INC., )
)
Defendant. )

## AFFIDAVIT OF DAVE FOSTER IN SUPPORT OF DISPOZ-O PRODUCTS, INC.'S MOTION FOR TRANSFER OF VENUE PURSUANT TO 28 U.S.C. § 1404(a)

I, David R. Foster, under oath depose and state as follows:

1. I am a Project Manager for the Defendant Dispoz-o Products, Inc. ("Dispoz-o"). I have personal knowledge of the facts stated in this affidavit, and I could completely testify to them if called to do so.

2. Dispoz-o is a manufacturer of plastic cutlery, which are produced by an injection molding process, and plastic drinking straws, which are produced by an extrusion process. Dispoz-o has as its sole manufacturing facility, a 520,000 square foot plant located on approximately eighty-two acres in Fountain Inn, South Carolina. Prior to becoming involved with Trexel, Dispoz-o was not engaged in making any foam products via foam sheet extrusion or thermoforming.

3. All of Dispoz-o's manufacturing occurs in South Carolina. None of Dispoz-o's manufacturing occurs in Massachusetts. All of Dispoz-o's executive offices are also in

South Carolina. Dispoz-o also has distribution centers located in Commerce, California and Houston, Texas. All Dispoz-o employees with knowledge of the issues raised in the Complaint, and who will likely be witnesses in this matter, reside in South Carolina.

4. Based upon its advertising and website, Trexel is in the business of licensing a "MuCell" process to produce microcellular foam, and selling certain equipment necessary to implement the process. The MuCell process involves injecting a gas, such as Carbon Dioxide or Nitrogen, into molten plastic during the manufacturing process, and utilizing that gas to create tiny, microscopic cells. In injection molding applications, this results in a part which is no longer "solid". Instead, it is filled with microscopic cellular pockets. According to Trexel, the MuCell process allows an injection molder to use less raw material, have lower clamp pressures and lower clamp times, thereby obtaining substantial cost savings in the manufacturing process. Trexel advertises that the "MuCell technology can be retrofitted easily into injection molding ...equipment" and that Trexel provides full "turnkey" support. A true and correct copy of Trexel's advertisement entitled Corporate Backgrounder is attached hereto as Exhibit A. Trexel's current website advertises that conversion of existing injection molding equipment is a "simple on-site installation within one week."

5. Based upon its advertising and website, Trexel works with plastic machinery equipment suppliers throughout the world who offer the MuCell option for their standard injection molding machines. As part if its business, Trexel engineers travel to the manufacturer's facilities to assist in the implementation of Trexel's process. Trexel has regional MuCell support centers throughout the United States, and in Germany, Japan, Singapore, and Korea.

6. Trexel initially proposed to Dispoz-o that it add the MuCell process to its injection molding process for making plastic cutlery. Dispoz-o did not accept this proposal, nor Trexel's proposal to add the MuCell process to its extrusion process for making plastic drinking straws. Trexel also indicated, however, that its MuCell process could be used to produce polystyrene foam sheet by extrusion. The foam sheet could then be heated and formed (thermoformed) to produce foam product, such as a plate or tray.

7. Dispoz-o was interested in this because it had considered entering the field of manufacturing foam trays. Dispoz-o had evaluated entering the foam business via a conventional extrusion process which uses hydrocarbon blowing agent(s). While these conventional processes are commercially viable, there are certain inherent dangers in using hydrocarbon blowing agent(s). Dispoz-o was not inclined to commence a foam manufacturing operation using hydrocarbon blowing agent(s).

8. In May of 2000, Trexel made an initial proposal to Dispoz-o whereby Trexel would design and provide MuCell equipment, and a process that would produce quality foam sheet capable of being thermoformed into trays. The Trexel equipment was only part of the equipment to be purchased. Dispoz-o would have to purchase equipment from other manufacturers. Although this other equipment was considered "standard" in the industry, Trexel agreed to assist Dispoz-o in the selection and specification of this other equipment, which was provided by Battenfeld Gloucester Engineering ("BGE"). Dispoz-o did not convert any existing equipment for the project.

9. The parties continued to negotiate, and entered into an Extrusion License Agreement in September, 2000. The Agreement required Dispoz-o to purchase four sets

3

of equipment from Trexel, one set for each of four foam extrusion production lines. The Trexel equipment for each line consisted of a primary extruder screw (offered at $18,000.00), a four-injector kit (offered at $10,000.00), die tooling (estimated at $10,000.00), and a blowing agent delivery system (offered at $123,240.00). This is a total of $161,240.00 per line, or $644,960.00 for all four lines. Under the terms of the Extrusion License Agreement, Dispoz-o was to pay license fees of $45,000 to $60,000.00 per year per line, for a total of $1,410,000.00 over a seven year period. Dispoz-o's total commitment to Trexel, in equipment purchases and license fees, was over 2 million dollars. In addition, Dispoz-o was constructing a facility and was purchasing equipment from other manufacturers.

10. In return, Trexel was to provide equipment and a process that would produce 925 pounds per hour per line of good quality, thermoform-able foam sheet. Dispoz-o's business model projected it could operate profitably at the rate of 925 pounds per hour. The license agreement also provided for Trexel to supply on-site start up support in South Carolina for up to fifteen days in up to three separate trips.

11. The Extrusion License Agreement was signed in September, 2000. The Trexel equipment for the first line was to be delivered to South Carolina in April, 2001, with production scheduled to begin in June, 2001. Lines two through four were scheduled to start production in October, 2001, January, 2002 and March, 2002, respectively. Dispoz-o expected to be up and running in July, 2001.

12. In June, 2001, Trexel reviewed and approved certain advertising material to be utilized by Dispoz-o regarding the MuCell foam tray products. As far as Dispoz-o knew, everything was on schedule for a July, 2001 production commencement date.

13. By July, 2001, however, Trexel did not have a commercially viable foam manufacturing process that would produce consistent foam product at a rate of 925 pounds per hour. Instead of fifteen days of on site support to get four foam extrusion lines up and running, Trexel spent at least eighty-eight days trying to get the first two lines up and running. Trexel was not able to do this successfully.

14. As late as August, 2001, Trexel was still setting parameters for attempted test runs at Dispoz-o for only 480 pounds per hour. A true and correct copy of an E-mail from Kelvin Okamoto dated August 16, 2001 is attached hereto as Exhibit B. Also in August, 2001, Irwin Research and Development, Inc., the thermoforming equipment manufacturer, advised Dispoz-o it was not going to return to the plant until it was assured that there was good quality foam sheet to use to set up the thermoforming process. A true and correct copy of a Letter from Craig Richardson, of Irwin Research and Development, dated August 28, 2001, is attached hereto as Exhibit C.

15. In early September, 2001, Dispoz-o notified Trexel that it was frustrated with this two and one-half months of "testing", and advised Trexel that Dispoz-o now had over 14 million dollars invested in this project and had lost 4.6 million in sales already. A true and correct copy of a letter from Peter R. Iacovelli, of Dispoz-o, to David Bernstein, of Trexel, dated September 11, 2001, with attachments, is attached hereto as Exhibit D.

16. Shortly thereafter, Trexel admitted that high quality sheet had only been produced once or twice on line number one since July, 2001, and never on line two. A true and correct copy of Trexel's Draft Proposal is attached hereto as Exhibit E. Trexel admitted it had not foreseen certain problems that were preventing production of foam at the

guaranteed rate. Trexel also proposed that Dispoz-o should cancel the orders for lines three and four at that point in time.

17. On October 5, 2001, David Bernstein, Trexel's President, admitted that on line two "there have <u>never</u> existed the conditions to run the microcellular foam process and to make microcellular foam products on this line." A true and correct copy of a letter from Trexel to Dispoz-o dated October 5, 2001 is attached hereto as Exhibit F. Trexel also acknowledged the "focus, commitment, good will, and competence of your team", with reference to the Dispoz-o personnel who were assisting to get the process up and running.

18. On October 10, 2001, Dispoz-o again detailed the myriad of problems and gave Trexel until December 1, 2001 to get the process up and running. A true and correct copy of a letter from Dispoz-o to Trexel dated October 10, 2001, is attached hereto as Exhibit G.

19. In response, Trexel again wrote and admitted "the whole system has never yet operated successfully at 925 pounds per hour." A true and correct copy of a letter from David Bernstein, of Trexel, to Peter R. Iacovelli, of Dispoz-o, dated October 16, 2001, is attached hereto as Exhibit H. Nevertheless, at the end of October, Trexel was still using process development plans showing attempted run rates of only 480 pounds per hour. A true and correct copy of Trexel's "Process Development Plan" for October 29 through 30, 2001, is attached hereto as Exhibit I.

20. Another meeting was held at Dispoz-o in November, 2001. At this meeting, Trexel (David Bernstein and Jere Anderson) presented an Ishikawa diagram, also referred to as a "fishbone" diagram. A true and correct copy of the Ishikawa diagram is attached

6

hereto as Exhibit J. This diagram had a whole list of probable causes of the end product, which was listed as "bad sheet."

21.     Trexel had represented to Dispoz-o that Trexel's technology and patents did not infringe upon patents belonging to any other party and that Trexel's patents were valid and enforceable. In late 2001, however, Dow Chemical Company asserted that, by using Trexel's CO2 technology, Dispoz-o was violating Dow's patents. By letter dated January 11, 2002, Trexel acknowledged to Dispoz-o that it had proceeded to entered into a license with right to grant sub-license with the Dow Chemical Company under U.S. Patents No. 5, 250, 577 and No. 5, 266, 605.

22.     The majority of persons likely to be called as witnesses in this case reside in South Carolina, or outside of Massachusetts. Witnesses from Dispoz-o who may testify regarding Dispoz-o's current manufacturing operation include Peter R. Iacovelli, Joseph D. Lancia, George Rodriguez, David R. Foster, and Alex Ali, a former Dispoz-o employee, all of whom are residents of South Carolina.

23.     Witnesses from Trexel, who were directly involved in the project and thus could testify to Trexel's embodiment of the patents, include Kelvin Okamoto, John Park, Jere Anderson and Kent Blizard. These individuals are engineers and scientists employed by Trexel, and were at Dispoz-o's manufacturing facility in an effort to achieve the represented performance requirements. Upon information and belief, Dr. Okamoto is a resident of California. Upon information and belief, Mr. Anderson and Dr. Blizard are residents of Massachusetts. Dispoz-o is unaware of Dr. Park's residence. Other potential witnesses from Trexel include David Bernstein, Richard Straff, and Roman Barski. Mr.

Bernstein is believed to be a resident of Massachusetts. Dr. Straff is believed to be a resident of New Jersey. Mr. Barski is believed to be a resident of Illinois.

24. Witnesses from BGE directly involved in the project and Trexel's embodiment of the patents include Tom Talbot and Nick Nigro. Mr. Talbot is a Field Service Engineer, who was at Dispoz-o's manufacturing facility and is believed to be a resident of Florida. Mr. Nigro is BGE's Southeast Regional Sales Manager, and is believed to be a resident of Georgia. Other potential witnesses from BGE include its Vice President of Sales and Marketing, Robert Weeks, its product manager, Doug Comeau, its Vice President of Engineering, Ken Warnock, and an engineer, Ken Sweet, who are believed to be residents of Massachusetts.

25. Subsequent to Trexel's failures to achieve the represented performance requirements, Dispoz-o consulted with other engineers and companies in the foam industry. Specifically, Dispoz-o primarily consulted with Horst Ditmar-Groene, who is a resident of Germany, and Linde Gas LLC, headquartered in Cleveland, Ohio. Witnesses from Linde Gas LLC include Michael Abshire, Applications Engineer, who is believed to be a resident of Ohio, and Richard Waskom, Process Market Manager, who is believed to be a resident of Georgia. These witnesses may be called to testify about Dispoz-o's current manufacturing operation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2004.

David R. Foster

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail hand on 7/2/04